UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v. ) | |
| ) | 1:04-CR-249 (CAP) |
| ) | |
| GREGORY C. KAPORDELIS ) | |
| ) | |
| DEFENDANT ) | |
| _____) | |

## REQUESTS MEMORANDUM IN SUPPORT
## OF ADDITIONAL DISCOVERY

In light of the Brady material discovered thus far in this case, the defense requests a pretrial discovery status conference to determine if additional Brady and discoverable information exists. The defense presents this request not as a fishing expedition, but to obtain specific reports that were either referenced in the affidavit presented by Agent Cory Brant for the search warrant application, or referenced in the documents that were produced already.

The discovery produced so far indicates that with regard to many of the interviews of juveniles, there is (1) a Russian report of the interview; (2)

1

An ICE report that documents the Russian interview; (3) An ICE summary of the ICE report that documents the Russian interview.

The defense has made several attempts to obtain this information from the prosecution.  In a letter received from AUSA Aaron Danzig last week, we were informed that no additional reports are in the hands of the prosecution or the case agents.  Our delay in filing the motion to suppress stems predominantly from not knowing if the reports simply do not exist anywhere, or have not been obtained by the AUSA or his case agent.

Given the gravity of the charges against Dr. Kapordelis, the complexity of the case in general and the number of foreign government officials involved in the investigation, the defense can not simply disregard potential Brady materials that may or may not exist.  Most of the Brady material obtained thus far has come from the prosecution, either through voluntary disclosure or at the defendant's request.  The documents that the defense seeks, and which are enumerated below presumably exist, because they have been identified (or the information contained in the report has been identified) in other documents furnished by the government.  For example, the government provided to the defense a report that indicated that Juvenile A was interviewed on March 6 (search warrant affidavit).  Yet, no report for March 6 was produced.

If the documents pertain to an interview of a potential witness, the defense must know if the interview took place and was not documented or if the interview did not take place at all but was erroneously reported as having taken place. There was an interview reported as having been conducted with Juvenile-D on March 6, 2004 (Bates #121-122), but later corrected as being, instead, an "interview of the Hotel Security Service regarding Juvenile D" (Bates #127).

On April 13, 2004, the U.S. Attorney announced in a televised press conference that the Department of Homeland Security conducted a **joint investigation** with the St. Petersburg Police Department regarding Dr. Kapordelis. Many of the interviews of juveniles were conducted jointly by American and Russian officials. In addition, at least one Russian law enforcement official is apparently part of a task force that is sponsored by the American government (Bates # 133).

In short, if exculpatory information or information otherwise favorable to Dr. Kapordelis was known, or is known by Russian law enforcement who were part of this "joint investigation," the defense expects that the information will be considered as if it were in the possession of American law enforcement.

## ISSUES RELATING TO RUSSIAN INVESTIGATION

1. DEFENSE REQUESTS MARCH 6, 2004 INTERVIEW REPORT OF JUVENILE-A BY OFFICER KOROLIOVA:  The search warrant affidavit refers to an interview of Juvenile A by Officer Koroliova on March 6, 2004.  Officer Koroliova also interviewed Juvenile-A on March 18, 2004.  The government recently provided the defense with Officer Koroliova's March 18th interview report but not the March 6th interview report.  Given the clear inconsistencies that exist between the actual March 18th interview report by Officer Koroliova and the internal summary of that report written by the Agent Kishkinsky, the defense is confident that there will be similar inconsistencies, and hence Brady material, in the March 6th interview as well.  Additionally, the search warrant affidavit, moreover, only includes the information supposedly provided on March 6, without even referencing the March 18 interview that provided inconsistent information.

2. DEFENSE REQUESTS THE MARCH 6, 2004 INTERVIEW REPORT OF JUVENILE-D BY OFFICER KOROLIOVA:  The defense has discovered that one of the March 6th interviews by Officer Koroliova, documented to have been of Juvenile-D, was, instead, an

interview of the Hotel Grand Europe Security Staff regarding their belief of what they believe would be the statement of Juvenile-D. If there was never an interview of Juvenile-D by Officer Koroliova on March 6th, the defense requests that this be confirmed.

3. DEFENSE REQUESTS ANY INTERVIEW REPORTS OF THE HOTEL SECURITY STAFF by any law enforcement officers, Russian or American. There were several statements attributed to the Security Service in the search warrant affidavit:

   a. One statement indicates that the Hotel reported that Dr. Kapordelis was visited by several orphanage workers who brought boys to Dr. Kapordelis and left them at the Hotel. The defense has specifically asked the basis for this false statement and no response has been provided.

   b. One statement indicates that the Hotel was aware of Dr. Kapordelis' adoption of Juvenile-E and reported this to the police. No report has been furnished to document this disclosure.

   c. One statement indicates that the Hotel reported to the police that they observed Juvenile-B going to the Hotel room with Dr. Kapordelis. The defense has requested any documentation of

this claim (the defense has interviewed this juvenile and he stated he has never been in the hotel in his life).

4. DEFENSE REQUESTS THE INTERVIEW REPORT OF JUVENILE-B.  This juvenile claims to have exonerated Dr. Kapordelis of any wrongdoing.  The report by the St. Petersburg Police referencing this juvenile would provide exculpatory evidence for the suppression hearing.

5. DEFENSE REQUESTS ANY INTERVIEW REPORT OF JUVENILE-E FROM THE APRIL 8TH INTERVIEW WHICH IS CITED IN THE AFFIDAVIT:  The defense possesses affidavits indicating that both Agent Lacy (American attaché in St. Petersburg) and the Russian Police interviewed Juvenile-E prior to the search warrant application.  The juvenile reports that everything he said to these agents was entirely exculpatory.  The affidavit by Agent Brant also indicates that there was an interview.  The defense can think of no other reason for the government to fail to produce this interview report.

6. DEFENSE REQUESTS ANY INTERVIEW REPORT OF JUVENILE F FROM THE APRIL 8TH INTERVIEW WHICH IS CITED IN THE AFFIDAVIT.  The defense has affidavits indicating

that both Agent Lacy and the Russian Police interviewed Juvenile-F prior to the search warrant application.  The affidavit by Agent Brant also indicates that there was an interview.  As with Juvenile-E, this juvenile has been interviewed and he denies having ever reported any misconduct by Dr. Kapordelis and, in fact, told the police that Dr. Kapordelis did not molest him, or anybody else, to his knowledge.  The government's interview of Juvenile-F should be furnished to the defense.

7. DEFENSE REQUESTS ANY INTERVIEW REPORT INVOLVING JUVENILE-C.  The only report presented thus far is the interview by SA Lacy on April 8, 2004, and the summary of that interview prepared by Agent Brant.  If there were no other interviews of this juvenile by any member of law enforcement, Russian, or American, the defense must be made aware of this fact in order to accurately prepare the suppression motion.  It seems unlikely to the defense that the first report of any contact with a Russian juvenile was by an American ICE agent.

8. DEFENSE REQUESTS A COPY OF THE VIDEO TAPE MADE BY THE RUSSIAN POLICE AND REFERENCED IN THE AFFIDAVIT.  The defense strongly believes that the tape will not be

prejudicial to Dr. Kapordelis as indicated in the affidavit. The government acknowledges possession of this videotape but has not furnished it to the defense because of "technical" problems in converting it to a format that can be used in the U.S.

9. DEFENSE REQUESTS A COPY OF THE HOTEL SURVEILLANCE TAPE PERTAINING TO THE VISIT OF JUVENILE A. A photograph from this videotape was presented by the Hotel Security Staff to Officer Koroliova. This photograph is referenced in the affidavit. Also, a timeline created by the investigating officers which referenced several pictures of Dr. Kapordelis, taken from the video surveillance tape. This would indicate that the video tape was preserved. The defense is certain that this tape contains exculpatory information and would show that the affidavit was founded on statements known to be false. It is unclear to the defense whether the government currently has possession of this tape, or not.

10. DEFENSE REQUESTS THE POLICE REPORT PERTAINING TO JUVENILE-D'S VISIT TO THE POLICE STATION ON NOVEMBER 14, 2004. If there was no report generated, the defense must know this fact for the suppression motion. Information provided

already establishes that Juvenile-D was brought to the police station on that day *and* that he denied that he was molested. All documentation of this denial should be produced.

11. DEFENSE REQUESTS THE POLICE REPORT PERTAINING TO JUVENILE-A'S VISIT TO THE POLICE STATION ON NOVEMBER 14 OR 15, 2004. If there was no report generated, so state. Again, reports produced already document that he did not report any molestation when interviewed by the police on those days.

12. DEFENSE REQUESTS THE REPORT OF THE INTERVIEW OF JUVENILE-A IN THE BASEMENT OF THE HOTEL ON NOVEMBER 14, 2004. The one hour interrogation was witnessed by Juvenile A's mother. If no report exists, so state. Police were present during this interview and it occurred prior to the time that the juvenile was brought to the police station (#10, above).

13. DEFENSE REQUESTS THE BORDER GUARD COMMUNICATION REVEALING DR. KAPORDELIS' ENTRIES AND EXITS FROM RUSSIA. There is a reference to this communication in a time-line which was produced by the government last week (Bates #320-25). Since the timeline is critical to the

9

Suppression Motion, the defense must know exactly what information was available to the investigative team.

14. DEFENSE REQUESTS THE INTERVIEW REPORT DOCUMENTING DR. KAPORDELIS' ARREST IN NEW YORK AND HIS DISCLOSURE AFTER HIS MIRANDA RIGHTS WERE ACKNOWLEDGED. There is a summary of that interview, authored by Agent Brant, but some facts are not reflected in the summary. For example, an exculpatory letter was read by both agents in New York; however, the summary does not reflect this fact. Also, the defense must discover what exculpatory information was conveyed to Agent Brant by the New York agents. This information is critical to the suppression motion. Report #NY07Q404MW009, report 001 is what we are requesting.

15. DEFENSE REQUESTS THE RUSSIAN SEARCH WARRANT EXECUTED ON DR. KAPORDELIS' RESIDENCE IN ST. PETERSBURG, RUSSIA ON APRIL 8, 2004. Agent Lacy was directly involved with this investigation before, during and after the search in question. Agent Lacy was outside Dr. Kapordelis' apartment while the search was being conducted.

16. DEFENSE REQUESTS ANY DISCOVERY DOCUMENTS PERTAINING TO THE SEARCH (AND THE FRUITS OF THE SEARCH) OF DR. KAPORDELIS' RESIDENCE IN RUSSIA.

17. DEFENSE REQUESTS INTERVIEW REPORTS REGARDING THE INTERVIEWS OF KAREN FANKHAUSER AND MS. HERNANDEZ AT THE GAINESVILLE SURGERY CENTER.  The affidavit only presented comments that would be unfavorable to Dr. Kapordelis.

18. DEFENSE REQUESTS ANY INFORMATION OBTAINED BY THE INVESTIGATIVE TEAM CONCERNING DR. KAPORDELIS' ARREST HISTORY, OR LACK THEREOF. Defense suspects that the information obtained was favorable to Dr. Kapordelis and for this reason was left out of the affidavit.

**AMERICA ONLINE SEARCH WARRANT:**

On August 13, 2004 Agent Brant presented Judge Feldman with a search warrant application to serve upon Dr. Kapordelis' AOL account.  The search warrant requested disclosure of every email that existed on his and his brother's accounts.  This would have naturally included e-mails between

Dr. Kapordelis and defense counsel. No precautions were taken to prevent improper disclosure of sensitive attorney/client correspondence.

The AOL data was received by Agent Brant on August 26, 2004. As defense counsel, I was not informed about the search warrant until approximately September 21, 2004. As soon as I received the warrant, I notified the A.U.S.A., Aaron Danzig, about the potentially serious violation of attorney client privilege. My concern was not only for the actual information contained in the e-mails but, more importantly, for the strategy of the defense which was discussed in those e-mails. Mr. Danzig assured me that all precautions would be taken to guarantee that privileged e-mails would not be viewed. This conversation occurred nearly a month after the AOL information was received by Agent Brant.

I have now personally reviewed the privileged e-mails contained in the AOL accounts which were seized. In the hands of the prosecution, this information prejudices Dr. Kapordelis' case because the e-mails define several of the strategies that the defense was going use to prove Dr. Kapordelis' innocence. In the hands of the government, an opportunity has been created whereby "gaps" in logic can be filled in; "dates of impossibility" can be "corrected"; defense witnesses can be interviewed with

direct knowledge of the information they possessed which would have exonerated Dr. Kapordelis, etc.

Though the AUSA and the case agent have informally stated that none of this information has been reviewed, we request that all documents be sealed and removed from the custody of both the case agent and the AUSA. The defense would also request that the government formally state whether any fruits from that search will be offered by the government.

RESPECTFULLY SUBMITTED,

GARLAND, SAMUEL & LOEB, P.C.

_____
DONALD F. SAMUEL, #624475

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 262-2225
dfs@gsllaw.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | |
| ) | **1:04-CR-249 (CAP)** |
| **GREGORY C. KAPORDELIS** ) | |
| **DEFENDANT** ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing *Memorandum In Support of Additional Discovery Requests* upon Aaron Danzig, Assistant United States Attorney by electronic mailing.

This 10th day of November, 2004.

_____
DONALD F. SAMUEL

14