# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

UNITED STATES OF AMERICA, )
                                 )
     **v.**                     )      **CASE NO. 1:04CR249**
                                 )
**GREGORY C. KAPORDELIS,**   )
                                 )
     **Defendant.**         )

### SUPPLEMENTAL BRIEF ON MOTION TO SUPPRESS REGARDING THE "FANKHAUSER" AND "HERNANDEZ" *FRANKS V. DELAWARE* ISSUE AS IT APPLIES TO THE "NEXUS" ARGUMENT

On July 5, 2005, the court held a hearing focusing on the issue of whether there was a *Franks v. Delaware* violation – i.e., material misrepresentations and material omissions – regarding the information allegedly furnished by two employees of the surgery center where Dr. Kapordelis worked.  These two employees, Karen Fankhauser and Marie Hernandez, were interviewed by ICE agents in anticipation of applying for the search warrant.  Their information was used by the ICE agents for two reasons: (1) to attempt to corroborate, to some extent, the allegation that Dr. Kapordelis was a person who molested children; and (2) to establish that there was some reason that a search of the home and office of Dr. Kapordelis

was supported by probable cause to believe that child pornography or evidence of the charged criminal conduct in Russia would be found there.

The testimony of the two witnesses established that: (1) they had no information that suggested, even by mere speculation, that Dr. Kapordelis had ever molested any child at any time or at any place; and (2) they had no information that suggested, even by the most relaxed measure of proof, that any child pornography or evidence of the charged criminal conduct in Russia would be found in his office or home.

The context of this hearing needs little introduction.  The ICE agents in America, based (or not) on information (and misinformation) supplied by their compatriots in Russia (both American and Russian), applied for a search warrants based on the claim that Dr. Kapordelis had molested children in Russia and that evidence of the crime would be found in his home and office in Gainesville, Georgia.  Counsel has extensively (an understatement) demonstrated that the information obtained from Russia was deceptive, insufficient, inconsistent, contradictory, fabricated and wholly inadequate to support the issuance of a search warrant.  Even assuming that a thread of credible information existed that Dr. Kapordelis engaged in any inappropriate conduct in Russia, there was still no basis for searching his home and office in Gainesville, Georgia.

To cure this insufficiency, the agents went to the two Surgery Center colleagues of Dr. Kapordelis with a "punch list" of items that they wanted to establish in order to prove to the Magistrate that a search of his home and office would likely yield fruit.

The agents interviewed Ms. Hernandez and Ms. Fankhauser and included in the search warrant affidavit certain innocent statements that they made, while omitting other exculpatory comments. They also fabricated certain information and attributed it to the two employees. They also misled the Magistrates about the overall statements of the two employees in order to create the impression that the two employees believed that Dr. Kapordelis did, in fact, molest the children and that evidence of his criminal behavior could be found at his home and office.

Reviewing the hearing transcript is made somewhat complicated by the necessity of distinguishing between: (1) what the witnesses testified to be the truth about the historical facts (or their knowledge of certain facts); (2) what the witnesses testified regarding what they told the agents; (3) what the agents testified that they were told by the witnesses. To some extent, there are irreconcilable conflicts between what the witnesses claim to have told the agents and what the agents testified that they were told by the witnesses. The Magistrate, of course, must reconcile these conflicts. The defense

suggests that these inconsistencies should be resolved in favor of what the witnesses said for two reasons: (1) there is simply no reason to believe that the witnesses would have told the agents a lie (*See* Tr. 30). Thus, to the extent that the agents claim that the witnesses told them something that the witnesses now say that did not say, *and* that they say is simply not true, it is more likely that the witnesses version of what they say that they said to the agents is more accurate than what the agents say that they were told; (2) the agents have a well-documented history, in this case, of making misrepresentations, omitting favorable information, and otherwise including information in the search warrant application that is inaccurate. Indeed, the government's position in this case is that there is no reason to include a witness's inconsistent statements in a search warrant application and no reason to include in the application any exculpatory information learned by the police, or, for that matter, any information that would contradict the existence of probable cause.

In April of 2004, Karen Fankhauser was interviewed for approximately 45 minutes by the agents. This was within a matter of hours of the search warrant application being signed by ICE Agent Brant and submitted to the Magistrate in Gainesville.

Karen Fankhauser testified that she had virtually no personal relationship with Dr. Kapordelis; she had been to his house on only two or three occasions since the two of them began working together six or seven years earlier. (Tr. 16).  The last time she had been to Dr. Kapordelis's house was for a Christmas party in 2003.  Approximately 75 people were in attendance at the party (Tr. 17).

Fankhauser also testified that she was aware of the imminent adoption by Dr. Kapordelis of a child in Russia (Tr. 19).  She told the agents about the adoption, as well (Tr. 20).

She was asked by the agents about blue and white pills (the supposed pills used by Dr. Kapordelis to give to children in Russia) and she said that there were no such pills at the clinic (Tr. 21).

The agents specifically asked Ms. Fankhauser about her awareness of any child pornography on Dr. Kapordelis' computer and she stated that she was aware of none.

With regard to computers, she was asked about Dr. Kapordelis' computers and she explained to them he had a computer at the clinic and a personal laptop that he used at the nurses' station (Tr. 22).  *She was only aware of that one laptop* (Tr. 33).

At the Christmas party, she had no recollection of having seen a computer anywhere in the house (Tr. 24).  She told the agents "the same thing" – that is, that she "[didn't] remember if there was computer [at his house] or not at the Christmas party."  (Tr. 24).  She remembers that Dr. Kapordelis had a camera at the Christmas party, but had no idea what kind of camera it was and did not tell the agents what kind of camera it was.  (Tr. 25, 40).

The search warrant application also claims that the two witnesses also provided information about children at the house (at times other than the Christmas part).  Ms. Fankauser testified that she had no knowledge about children at his house, because their relationship was professional (Tr. 25), though she later acknowledged being aware that some kids were at the house, perhaps with their parent, perhaps not, she simply did not know (Tr. 43, 51) ("I don't know who was in his home." Tr. 43).  On one occasion, Ms. Fankhauser had been on Dr. Kapordelis' boat on Lake Lanier (Tr. 26).  She does not recall any children being on the boat on that occasion (Tr. 26, 47-48).  She did not tell the agents that any children were on the boat (Tr. 26).

On the topic of Dr. Kapordelis' volunteering at a Christian Youth Camp, Karen Fankhauser testified that she had no knowledge when he last

worked there, and she would not have told the agents that she was aware when he last worked there, because she did not know (Tr. 27). (Agent Brant subsequently learned that Dr. Kapordelis last worked there several years earlier). She is also unaware of any other camps (if any), at which Dr. Kapordelis worked (Tr. 28) and she did not tell the agents that he had worked at any other camp (Tr. 28).

She testified that she never told the agents that Dr. Kapordelis "routinely" had children over at his house. In fact, she was not aware that he ever had children from Russia at the house and she never told the agents otherwise (Tr. 28). She was aware that Dr. Kapordelis had *adult* visitors from the Czech Republic and Africa visit (Tr. 30). She did not specifically recall telling the agents that she was aware that he had minor children at his house and on his boat, but does not know that to be true and would not have lied to the agents (Tr. 32-33).

During the interview with the agents, Ms. Fankhauser was doing most of the talking, and this was natural, because Marie Hernandez had only known Dr. Kapordelis for a few months at the time of the April, 2004 interview (Tr. 31, 55). Ms. Hernandez told the agents that she had only been at the clinic for five months, as of the time of the interview (Tr. 56, 91, 103,

136). In essence, Karen Fankhauser did the talking and Ms. Hernandez basically "nodded her head every once in a while." (Tr. 31).

Ms. Hernandez had never been on the boat at Lake Lanier. (Tr. 56). She did attend the 2003 Christmas party (Tr. 56). She told the agents that that was the only time she had ever been at his house, that is, a three hour Christmas party (Tr. 57, 58, 103, 136). She told the agents that she had no other social relationship with Dr. Kapordelis whatsoever (Tr. 58). She saw him taking pictures at the Christmas party, but, like Ms. Fankhauser, she had no idea what kind of camera he was using (Tr. 61).

Regarding Dr. Kapordelis' work at camps, Ms. Hernandez had no personal knowledge and told the agents this, but she had heard that he did some volunteer work, somewhere, sometime (Tr. 61).

She was asked by the agents whether she was aware of any inappropriate behavior on the part of Dr. Kapordelis towards children and she told them that she was not aware of any such behavior (Tr. 62, 106).

She was not aware of any pornography on Dr. Kapordelis' computer (Tr. 62-63). She had a vague recollection of seeing a computer at the house during the Christmas party, but could not say whether it was a laptop, or a desktop. As she testified, "Everybody has a computer, it's like a toaster." (Tr. 63). When asked by the agents, she told them that she did not recall if

the computer was on, or if the monitor was on, or any specifics about the computer at all.  (Tr. 64).

Ms. Hernandez did not tell the agents that she had any knowledge of kids being at his house from other countries (Tr. 65, 109, 136).  She was aware that he had visitors from foreign countries, but did not know if they came with their parents, or not (Tr. 66).  Regarding Dr. Kapordelis' "unusual" practices, Ms. Hernandez explained that she thought it was unusual that Dr. Kapordelis would travel so often (Tr. 69, 70-71).  She also found it odd, based on her raising three sons, that he would want to adopt a 15 year-old boy (Tr. 71).

The agents who testified also acknowledged that the arrest of Dr. Kapordelis occurred prior to the execution of the search warrant.  The arresting agents in New York intercepted Dr. Kapordelis at customs at around 4:30 p.m. and were in a room with him (Tr. 168) – and his laptop and two digital cameras, all of which they examined, including pictures, with no discovery of any pornography (Tr. 164) – prior to the time the search warrants were executed.

# ARGUMENT

As explained in the initial Motion to Suppress that the defense filed in January, the search warrant application in this case fails to muster any proof that evidence of a crime (or contraband) would be found in the home of Dr. Kapordelis.  The search warrant application starts with the boilerplate language that child pornographers (collectors, or manufacturers) are known to keep child pornography in their homes.  Maybe so.  But once the premise of this argument disappears, so does the conclusion.  There was simply no evidence known to the affiant to support the contention that Dr. Kapordelis was a child pornographer.  In fact, the only mention of child pornography in the search warrant application (other than the boilerplate generic information) was attributed to an "operational source" who, it now turns out, was Andrei Lapov.  Lapov, as the court now knows from information supplied by various sources:

(1) physically molested one of the alleged victims in Russia over the course of four years (i.e., "C");

(2) showed pornography to, and tried to molest, two other children in Russia (i.e., "H" and "A");

(3) coerced (in concert with Officer Koriliova) the children to make false statements about Dr. Kapordelis (i.e., "A", "C", "D", "H" and "M");

(4) is, himself, a serial child molester and sadist;

(5) has a criminal conviction for theft;

(6) was known to the public prosecutors in Russia to be involved in acts of pedophilia;

(7) had his identity mysteriously hidden *by the American agents* from the defense (i.e., his name was repeatedly redacted from all ICE reports furnished to the defense until January 2005, and his identity as the "operational source" was not revealed until July, 2005);

(8) has no known history of being the slightest bit credible in providing information to the police;

(9) had no known basis for the allegation contained in the search warrant application.

In short, it is not suggesting too much that if this "operational source" claimed that Dr. Kapordelis possessed and was distributing child pornography, a reasonable person could assume just the opposite. Even the affiant declined (in a rare display of candor) to suggest that the "operational source" was credible, or that he had any known basis for his allegation. *See United States v. Brundridge*, 170 F.3d 1350 (11th Cir. 1999); *United States v. Hammond*, 351 F.3d 765 (6th Cir. 2003).

Thus, what is left is a certain amount of information (i.e., whatever is left after the *Franks v. Delaware* corrections are made) relative to the behavior of Dr. Kapordelis in Russia, none of which involved any child pornography or the use of any computer that was then located at his home or office in the commission of a crime, much less a computer at the defendant's home or office.

Hence, the agent's need to interview Karen Fankhauser and Marie Hernandez.

What the agents actually learned, however, contributed nothing to the probable cause determination relating to any criminal conduct *or* the likelihood that any evidence whatsoever would be found in his house:

1. The hyperbole of the application notwithstanding, the two witnesses were aware of absolutely no misconduct by Dr. Kapordelis in Gainesville, Georgia (or anywhere else).

2. The witnesses were aware of no child pornography (or any kind of pornography) on his computer.  Any computer, anywhere.

3. Though he owned a laptop (*a* – one – laptop) of which they were aware, neither specifically was aware that it was ever in his home, and certainly not on April 12, 2004, when Dr. Kapordelis was in Russia, or *en route* back from Russia somewhere over the Atlantic Ocean.

4. In fact, ICE – the agents in New York who were working with the agents in Atlanta – knew that his laptop was sitting on a table with them at the very same time that the agents in Atlanta were thinking about approaching a Magistrate to obtain a search warrant to search for, and seize, the laptop in his home, or office, in Gainesville, Georgia.  The same argument applies to the cameras.

5. The agents also *knew* that Dr. Kapordelis had a laptop with him in Russia during this time – the same laptop that he had when he was intercepted in New York – because it had been searched by Russian police at the apartment of Dr. Kapordelis and the affiant referred to this in the search warrant application.

6. One of the witnesses *may* have seen *a* computer in his house four months earlier.  She likened it to having seen a toaster in a house. There was absolutely no reason to believe that the computer that she saw (if she saw one) was not the exact same computer that had previously been examined by the Russian police and that was in the possession of the ICE agents in New York.

7. Even if there had been a computer that was likely to be found in the house (a premise that is based on nothing more than sheer speculation – like assuming that there is a toaster in my house), there was no

reason to believe that any child pornography or evidence of a crime would be found on the computer.  There was no evidence presented to the Magistrate about any illegal downloads from the internet service provider for Dr. Kapordelis, any improper email communications between co-conspirators or children, or any other evidence of criminal activity that was likely to be found on a computer.

In addition to these facts that demonstrate the absence of any "nexus" to the house, the affiant also misrepresented numerous facts (and omitted others) that skewed the Magistrate's ability to make a reasoned judgment about the existence, *vel non* of probable cause.

1.    The affiant was aware that Ms. Hernandez had only known Dr. Kapordelis for five months, and had only been to his home one time (for the Christmas party) and that she had absolutely no first-hand knowledge of any activities of Dr. Kapordelis; her statements during the interview, which were recited in the affidavit, were based, instead, on gossip, hearsay and rumor – a fact that was never disclosed to the Magistrate.

2.    The affiant claimed that <u>Hernandez and Fankhauser said that Dr. Kapordelis routinely had children at his house</u>.  Actually,

Hernandez had only known Dr. Kapordelis for five months (a fact that was not revealed to the Magistrate) and had never been to Dr. Kapordelis' house except for one Christmas party, at which there were approximately 75 people present and one child with his parents.  Karen Fankhauser was not aware that children were ever at the house unaccompanied by a parent.  She testified, "I would have no knowledge of children at his house because my relationship was professional."  The impression conveyed by the affidavit – and intended to be conveyed – was that Dr. Kapordelis brought minor children from foreign countries to his house to molest them all the time (in the affidavit, the affiant said, "routinely").  There was absolutely no basis whatsoever for this implication.  In fact, what the witnesses told the agents was that *one* kid (who, according to Agent Bergstrom's notes, was 17 – 18 years old), came over to the house of Dr. Kapordelis "on and off *all the time*", as opposed to "children came to the house all the time" (Tr. 146; and Exh. 10).

3.  <u>Dr. Kapordelis had children on his boat unattended by parents or guardians</u>.  Both witnesses denied any knowledge of children being on his boat.  Fankhauser testified that if there were children on the

boat the one time she was on the boat, it may have been the

children of other people (staff) who were also on the boat from the

surgery center.

4.    <u>Dr. Kapordelis worked for "Young Life" and other youth camps</u>.

Again, the purpose of including this information in the affidavit

was to imply that Dr. Kapordelis molested children at summer

camps.  The witnesses acknowledged, however, that Ms.

Fankhauser was aware that at some point in time (when, she did not

know) Dr. Kapordelis volunteered at a summer camp, and Ms.

Hernandez had no personal knowledge of this, or any other camp

activity, at all.  The fact of the matter is that Dr. Kapordelis

volunteered at Young Life one week per year; and that he had not

done so since the year 2000.

5.    <u>Ms. Fankhauser and Ms. Hernandez saw computers and a digital</u>

<u>camera in his house during a Christmas party four months earlier</u>.

Ms. Fankhauser denied seeing a computer and denied telling the

agents that she had.  Ms. Hernandez recalled seeing a computer on

a desk in a bedroom where she left her coat, but had not specific

knowledge of what kind of computer it was (laptop or desktop) or

whether it was on.  Neither witness was aware that the camera with

which Dr. Kapordelis took pictures at the Christmas party was
digital.

Based on the evidence presented at the hearing, as well as authorities
submitted by the defense in the initial Motion to Suppress, the government
has failed to show that there was probable cause to believe that a search of
the premises was likely to yield the discovery of any evidence or contraband.
Indeed, there was less than probable cause to believe that even a computer
could be located there, given the fact that the agents knew that his computer
had been searched in St. Petersburg, Russia and was then in the possession
of agents in New York. *See generally United States v. Gourde*, 382 F.3d
1003 (9th Cir. 2004) (The FBI learned about a website that permitted
members to download child pornography.  Defendant Gourde was
determined to have been a member of the web site for two months.  The FBI
obtained a search warrant, claiming that any member would have had access
to the child pornography.  The affiant offered various expert opinions about
the M.O. of child pornographers on the internet.  The Ninth Circuit held that
there was no probable cause to search the defendant house and seize his
computers based on this information.  Moreover, *Leon* did not apply,
because no officer could have relied in good faith on this warrant.  There

was no information that Gourde had actually downloaded *any* files from the

website, though the FBI acknowledged that it had the capability of

determining whether he did prior to the time the search was executed);

*United States v. Zimmerman*, 277 F.3d 426 (3rd Cir. 2002) (The police

obtained a search warrant to search the defendant's home to look for child

and adult pornography.  There was no information in the warrant application

that indicated that any pornography would be found in his home, though

there was information that one clip of adult pornography was seen in the

home months earlier by one (or perhaps more than one) high school student.

That information, however, was stale.  The police relied for the most part on

evidence that the defendant was believed to have molested numerous high

school students (he was a high school teacher).  The police also offered

expert opinion in the warrant application that child molesters often keep

child pornography in their houses.  The Third Circuit held that the warrant

was lacking in probable cause and, in fact, could not even have been

executed in good faith, given the absence of any evidence that pornography

was then located in the house.  The use of a seven page, single spaced,

affidavit which never even mentioned child pornography could not

reasonably have been relied upon to obtain a search warrant.  Addressing the

boilerplate "expert" opinion, the court wrote, "Rambling boilerplate

recitations designed to meet all law enforcement needs do not produce

probable cause . . . Experience and expertise, without more, is insufficient to

establish probable cause.").  *See also United States v. Weber*, 923 F.2d 1338

(9th Cir. 1990); *United States v. Ricciadelli*, 998 F.2d 8 (1st Cir. 1993);

*United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993); *United States v.*

*Ramos*, 923 F.2d 1346 (9th Cir. 1991); *United States v. Brown*, 951 F.2d 999

(9th Cir. 1991); *United States v. Hove*, 848 F.2d 137 (9th Cir. 1988); *United*

*States v. Rios*, 881 F.Supp. 772 (D. Conn. 1995); *United States v. Gomez*,

652 F.Supp. 461 (E.D.N.Y. 1987).


## CONCLUSION

For the foregoing reasons, Dr. Kapordelis urges this court to grant his

*Supplemental Brief on Motion to Suppress Regarding the "Fankhauser" and*

*"Hernandez" Franks v. Delaware Issue As It Applies to the "Nexus"*

*Argument.*

This 8th day of August, 2005.


_____
DONALD F. SAMUEL
Ga. State Bar No. 624475

GARLAND, SAMUEL & LOEB, PC
3151 Maple Drive, NE
Atlanta, Georgia  30305
Phone:        404-262-2225
Fax:           404-365-5041
dfs@gsllaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** ) | | |
| ) | | |
| **v.** ) | **CASE NO. 1:04CR249-CAP** | |
| ) | | |
| **DR. GREGORY C. KAPORDELIS** ) | | |
| ) | | |
| **Defendant.** ) | | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing

*Supplemental Brief on Motion to Suppress Regarding the "Fankhauser" and*

*"Hernandez" Franks v. Delaware Issue As It Applies to the "Nexus"*

*Argument* upon Aaron Danzig, Assistant United States Attorney by

electronic filing.

This 8th day of July, 2005.

_____
DONALD F. SAMUEL
Georgia State Bar #624475