IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 1:04-CR-249-CAP-GGB |
| GREGORY C. KAPORDELIS | : | |

**RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF
ON MOTION TO SUPPRESS**

COMES NOW the United States of America, by David E. Nahmias, United States Attorney, and Aaron M. Danzig and Robert C. McBurney, Assistant United States Attorneys, and files this Response to Defendant's "Supplemental Brief on Motion to Suppress Regarding 'Fankhauser' and 'Hernandez' Issue" (Doc 138).

**I. INTRODUCTION**

On July 5, 2005, this Court held a hearing focusing on three issues: (1) contact between Customs officials and Defendant at JFK Airport in New York on April 12, 2004, when Defendant was arrested, (2) information provided to the Government by two of Defendant's co-workers, Karen Fankhauser and Marie Hernandez, that was incorporated in the affidavit for a search warrant for Defendant's house, and (3) "attribution of knowledge of Russian law enforcement officers." (Docs 131, 135-2). At the conclusion of the hearing, the Court asked the parties to brief the specific question of whether the evidence adduced at the hearing from Fankhauser, Hernandez, and two ICE agents "supports [Defendant's] claim that

the agents made material misrepresentations." (Doc 135-184).[1]

This brief, as directed, responds to the Court's question by answering that there were no fatal <u>Franks</u> violations. Indeed, the evidence developed at the July 5 hearing demonstrates with considerable clarity (a) that there were no material misrepresentations by the affiant and (b) that the information gathered from Fankhauser and Hernandez provided the nexus necessary to link the allegations of the Russian boys (i.e., claims of molestation and of Defendant taking digital pictures of same) to items that might be found in Defendant's house.

This brief also addresses Defendant's contacts with ICE agents in New York when he was arrested on April 12, 2004. Specifically, the Government contends that, because Defendant offered to show the agents a document on his laptop computer and then consented to a review of files on his computer, without limitation, he voluntarily ceded any reasonable expectation of privacy in his computer. As such, his motion to suppress evidence seized from this computer should be denied.

---

[1] The Court did <u>not</u> ask the parties to further discuss the merits (or lack thereof) of the increasingly bizarre and unfounded allegations raised by Defendant's Russian "investigator" concerning one Andrei Lapov. Given the Court's explicit instructions, the Government has nothing to say about that matter here. When there are actual facts to discuss, the Government will respond in a separate filing, so as not to blur unrelated issues.

## II. FANKHAUSER AND HERNANDEZ

1. <u>HOW THE INTERVIEW WAS CONDUCTED</u>

On April 12, 2004, ICE Special Agents Brant and Bergstrom traveled to Health South's offices in Gainesville, Georgia, in hopes of interviewing one or more co-workers of Defendant. (Doc 135-73-74, 113). The purpose of their trip was to gather additional evidence of (a) Defendant's contact with children and (b) whether there were computers and photography equipment in Defendant's residence to determine whether there was sufficient evidence to apply for a search warrant. (<u>Id.</u> at 77-78, 114). The agents did not know with whom they would be speaking when they arrived; they simply asked the receptionist for the office manager or someone else in charge. (<u>Id.</u> at 75-76, 114-115).

Karen Fankhauser, with Marie Hernandez in tow, met with the agents in a small office (not Defendant's office). (<u>Id.</u> at 76-77, 115). The agents did not ask for two interviewees; Fankhauser brought Hernandez along because she, too, was "familiar with" Defendant. (<u>Id.</u> at 76). The agents initially did not share with Fankhauser and Hernandez the allegations concerning Defendant's crimes against children. (<u>Id.</u> at 59, 68, 77).

In a departure from normal interviewing procedures that was dictated by the fact that Defendant was landing in New York only hours later, the agents interviewed the two Health South workers together rather than separately. (<u>Id.</u> at 76, 115-116). Agent

-3-

Brant was the primary questioner, with Agent Bergstrom serving as a scribe of sorts (although both agents took some notes). (<u>Id.</u> at 78, 118). The interview, per ICE policy, was not electronically recorded. (<u>Id.</u> at 78, 117). According to the agents, both women were alert, coherent and thoroughly cooperative throughout the session. (<u>Id.</u> at 117). The interview lasted no more than an hour. (<u>Id.</u> at 36-37, 80, 120).

Throughout the interview, both Fankhauser and Hernandez answered questions posed by the agents. (<u>Id.</u> at 35-36, 68, 79-80, 119-120). Sometimes Fankhauser would provide a lengthy response and Hernandez would simply nod her head in agreement and sometimes vice-versa. (<u>Id.</u>). If at any time one woman disagreed with what the other had just said, she would make that clear to the agents. (<u>Id.</u> at 44-45, 68-69). Agent Bergstrom attempted, in his notes, to attribute statements to either Fankhauser or Hernandez, where appropriate, but admitted that he had trouble keeping up with what was being said. (<u>Id.</u> at 79). Neither Fankhauser nor Hernandez took notes during the interview, so their testimony on July 5, 2005, was limited to what they recalled from April 12, 2004, unaided by contemporaneous notations. (<u>Id.</u> at 36).

2. <u>WHAT WAS SAID DURING THE INTERVIEW</u>

In his original <u>Franks</u> motion, Defendant leveled several accusations of affiant misrepresentation or outright falsity concerning the interview of Fankhauser and Hernandez. (Defense

-4-

Exh. S).   Counsel for the Government and for Defendant explored these allegations with each of the witnesses who testified in the <u>Franks</u> hearing on July 5.   The facts thus developed show that, while Agent Brant did make mistakes concerning what Fankhauser and Hernandez said when he drafted his affidavit, there nonetheless remained in the affidavit a solid core of valid information supporting the contention that there was probable cause to believe that evidence of Defendant's crimes would be found in his home.

   A. <u>Computers and Cameras in Defendant's House</u>

   The central nexus between the crimes Defendant committed in Russia and his residence was technological: computers and digital camera equipment.   Several of the juvenile victims from St. Petersburg told Russian authorities that Defendant photographed them and later showed them the pictures on his computer.  (Search Warrant Affidavit, ¶¶ 18, 30, 32).  Thus, any information tending to show that Defendant had any such equipment -- computers or digital cameras -- in his house would be particularly compelling support for the proposed search warrant.[2]

_____

   [2]   Defendant has suddenly, at this rather late juncture, pressed the notion that this prosecution is somehow about his possession of illegally downloaded child pornography, as opposed to child pornography that he produced as he photographed himself molesting his own victims.   (Doc 138-14).   This focus, and Defendant's heavy reliance in his brief on case law involving passive possessors of child pornography, is odd given that the central allegations in the search warrant affidavits related to Defendant's molestations of boys and photographs of them, not possession of child pornography.

The evidence presented at the July 5 hearing showed that Agent Brant, while not error-free in his presentation to the Magistrate, attempted to faithfully recount what he and Agent Bergstrom recalled Defendant's co-workers saying concerning the presence of such equipment in Defendant's house and at his place of work.

Fankhauser agreed that she told the agents that Defendant had a desktop and a laptop computer at work, with the latter being Defendant's personal property. (Doc 135-37). She also testified that she was aware that Defendant shuttled the laptop back and forth between home and work. (Id. at 38). As for the critical issue of whether Fankhauser told agents she had seen a computer in Defendant's house, her answer in July 2005 was "I don't recall." (Id. at 39). Not, as Defendant would have the Court believe, "No, I have never seen a computer in Defendant's house" but rather "I don't recall what I told the agents when they asked."

Fankhauser also admitted that she (a) attended the 2003 Christmas party hosted by Defendant at his house, (b) saw Defendant taking pictures at the party, and (c) later saw pictures of the party on Defendant's computer at work.[3] (Id. at 39-40). She could not recall, however, if the camera she saw Defendant using at the holiday party was digital. (Id. at 40).

Hernandez, too, was familiar with some of Defendant's

---

[3] Fankhauser also testified that she had seen, on Defendant's computer, pictures of various known and unknown boys. (Id. at 40).

-6-

computing equipment.  She knew he had a laptop at work and she recalled seeing a computer of some sort while at Defendant's house during the 2003 Christmas party.  (Id. at 61, 63).  She specifically placed the computer at Defendant's house in his bedroom (and, in fact, two desktops and one laptop computer were recovered from Defendant's house (see Search Warrant Return, provided in discovery as Bates 0011-12)).  (Id. at 63).

As for digital photos and digital cameras, Hernandez recalled Defendant taking pictures at the 2003 Christmas party, but could not recall, at the July 5 hearing, whether she later saw any of those shots on Defendant's computer.  (Id. at 61, 70).  However, she, like Fankhauser, did recall seeing digital pictures of Defendant with children on Defendant's computer.  (Id. at 40, 70).

Much of the above is consistent with the testimony and notes of Brant and Bergstrom, and, more importantly, with the language of the affidavit.  Bergstrom's notes contained a verbatim entry of "Karen saw desktop at Christmas party."  (Id. at 83).  Bergstrom testified that this entry meant, not surprisingly, that Karen Fankhauser told the agents on April 12, 2004 that she recalled seeing a desktop computer at Defendant's house at some point during the 2003 Christmas party.[4]  (Id.).  On the very next page of

---

[4] A second canard Defendant sets forth in his brief is the notion that Agent Brant knew that Defendant's laptop was already in ICE custody in New York when he presented his warrant application to the Magistrate and so should have known that no other computer would be found in Defendant's house.  (Doc 138-13).  Agent Brant

-7-

Bergstrom's notes was the entry "Marie saw digital camera," meaning, according to Bergstrom, that Marie Hernandez saw a digital camera in Defendant's house during the same holiday party. (Id.). Finally, Bergstrom showed the Court where, in his notes, he had recorded that Hernandez told the agents that Defendant had actually shown her a group photo of children on a computer at his home during the holiday party. (Id. at 84, 86).

Agent Brant testified that he recalled both Fankhauser and Hernandez having said that they had seen a computer in Defendant's house. (Id. at 129). His notes reflect that, at a minimum, Fankhauser told the agents that she had seen a desktop computer in Defendant's house, which is, of course, consistent with Agent Bergstrom's notes. (Id. at 83, 129-30). As for a digital camera, Brant candidly acknowledged that he could not remember if Fankhauser specifically said she saw a digital camera as stated in his affidavit but properly resisted the notion that anything malicious was afoot. (Id. at 131). While certain that he had asked both women about seeing a digital camera at Defendant's house, he admitted that only Hernandez appeared to have responded affirmatively, as reflected in Bergstrom's notes.[5] (Id. at 130-

_____

knew no such thing; he simply had been advised that Defendant was in custody and "was talking." (Doc 135-148). Moreover, he had been told only hours before by Fankhauser that Defendant had a desktop computer in his house. (Id. at 83, 129-30).

[5] Brant's claim in the affidavit that both co-workers saw a digital camera in Defendant's house was incorrect but not so far

-8-

131).

B. <u>Children in Defendant's House</u>

A second area of dispute centers on what Defendant's co-workers said about the frequency with which Defendant would have young boys stay at his house.   While this topic is obviously relevant to the overall issue of Defendant's pedophilia, it is less germane to the issue of an evidentiary nexus between Defendant's home and his illegal conduct in Russia.  After all, the Government never alleged that it would find sexually-abused children in Defendant's house when the search warrant was executed. Nonetheless, the topic bears exploration, as the evidence developed at the July 5 hearing demonstrates that Agent Brant faithfully reproduced in his affidavit information provided by Fankhauser and Hernandez.

Agent Brant, in his affidavit, wrote that, according to Fankhauser and Hernandez, Defendant "routinely" had children over to his house.  (Search Warrant Affidavit, ¶ 38).  At the <u>Franks</u> hearing, Fankhauser acknowledged that she told Agents Brant and Bergstrom that Defendant did, in fact, have children over to his house; her dispute was simply with Agent Brant's descriptive

_____

from the mark as to smack of deceit.  At least one of the co-workers had affirmatively stated, as memorialized in Bergstrom's notes, that she had seen a digital camera in Defendant's house. Moreover, both Fankhauser and Hernandez acknowledged that during the course of the interview, sometimes one would answer and the other would simply nod in agreement, without verbally responding. (Doc. 135-36, 68).

adjective "routinely," a term she asserted she never used. (Doc 135-41-42). Nonetheless, she admitted that she had told the agents about boys from Africa and the Czech Republic coming to stay with Defendant. (Id. at 42).[6]

Hernandez, too, stated that she was aware Defendant "brought children from outside the United States" to live with him. (Id. at 65). While acknowledging at the July 5, 2005 hearing that she acquired this information from co-workers rather than from Defendant himself, Hernandez was clear that it was individual juvenile boys that Defendant was bringing into his house and not entire families.[7] (Id. at 67). Indeed, so aware of Defendant's proclivity was Hernandez that she told agents that she could not think of anyone else who surrounded himself with children as much as Defendant did. (Id. at 69, 125-26).

All of this is consistent with the agents' independent recollection of what Fankhauser and Hernandez said during the interview. (Id. at 87-88, 126). The agents' contemporaneous notes, too, corroborate Fankhauser and Hernandez' testimony. Agent Bergstrom's notes reflected that one or both of the women told him that Defendant had children from other countries stay with him.

---

[6] Fankhauser also told the agents that Defendant "frequently" traveled to these very same places whence the boys came. (Id.)

[7] Importantly, Hernandez did not disclose to the agents on April 12, 2004, that some of the information she provided was not based on firsthand knowledge. (Doc. 135-108-09).

(<u>Id.</u> at 87).  His notes also provided the source for that lightning rod of litigation, the word "routinely."  Agent Bergstrom's notes read that Defendant had a teenager "at his house on and off all the." (<u>Id.</u> at 88).  The written sentence ends there, but Bergstrom testified that he meant to write "all the *time*." (<u>Id.</u>).  Agent Brant, relying in part on Bergstrom's notes when preparing his affidavit, substituted a more succinct synonym -- "routinely" -- for "all the time" when describing the frequency with which Defendant, according to Fankhauser and Hernandez, had juveniles stay at his house.  (<u>Id.</u> at 124-25).[8]

C. <u>Defendant's Contact with Children Outside his House</u>

The third and final contested topic arising out of the Fankhauser/Hernandez interview concerns Defendant's contact with children outside of either work or home.  As with the question of children living in Defendant's house, this subject is of limited interest in establishing a nexus between his Russian crimes and his house.  It merits examination here, not only to show that Agent Brant endeavored throughout to report accurately to the Magistrate

---

[8]   Agent Brant readily acknowledged error when testifying further about that portion of his affidavit dealing with the presence of children in Defendant's house.  Specifically, he explained to the Court that it was incorrect to include mention of *Russian* children being in Defendant's house; there was, at the time of the drafting of the affidavit, evidence only of African and Czech boys staying with Defendant.  (<u>Id.</u> at 127).  Of course, Fankhauser and Hernandez were both aware that Defendant was attempting to adopt a Russian boy, so it is understandable that Russian children may have been mistakenly included.  (<u>Id.</u> at 19, 62).

what Defendant's coworkers told him, but also to further explain the scope of Defendant's role as a child predator and his extreme interest in young boys.

The testimony from Fankhauser was quite clear: she told the agents that Defendant volunteered at a Young Life youth camp. (Doc 135-26-27, 41). She even acknowledged that she volunteered this information to the agents because the focus of the interview was, in part, on Defendant's contact with children. (Id. at 41). As for whether Defendant had children on his boat when Fankhauser was a guest (a claim the agents' notes reflect), she stated simply that, as of July 5, 2005, she could no longer recall. (Id. at 49).

Hernandez testified that she had heard from co-workers that Defendant had worked with children at a place like Young Life, though she could not attach a name to the location. (Id. at 60). In fact, she was certain that she told the agents that she "had heard" that Defendant "had done that kind of volunteer work with children." (Id. at 61). She also testified that she recalled Fankhauser mentioning Defendant's extracurricular work with youth groups during the interview with the ICE agents. (Id. at 60).

The agents' recollections and notes contained nothing different. Agent Bergstrom shared with the Court that he had written down that one or both of the interviewees had mentioned Young Life as a place where Defendant volunteered. (Id. at 83-84). Moreover, his recollection was that this information (and the fact

-12-

that Defendant had served a camp physician) was spontaneously "offered up" by Fankhauser and Hernandez, rather than being the product of a specific question. (Id. at 87-88).

Agent Brant's notes from the Fankhauser/Hernandez interview were similarly corroborative. In them, he had written down that Defendant had been a physician at youth camps and had been active in the Young Life organization. (Id. at 131-32). While Brant testified that he may have erred in his affidavit in attributing the Young Life claim to both Fankhauser and Hernandez, the latter's testimony, as set forth above, suggests that both women discussed the topic with the agents in April of 2004. (Id. at 132).

3. HOW THE INTERVIEW WAS INCORPORATED INTO THE AFFIDAVIT

A final important set of facts elicited at the July 5 hearing concerns the process by which Agent Brant prepared the April 12, 2004 affidavits for the searches of Defendant's home and place of work. First, Brant had access to and regularly relied upon Agent Bergstrom's handwritten notes from the interview when drafting the affidavits. (Doc 135-122, 125, 139). However, Agent Bergstrom did not review Brant's affidavit before it was presented to the Magistrate because he was busy corralling other law enforcement support for the potential search of Defendant's home and place of work. (Id. at 81). Thus, discrepancies, if any, between what Bergstrom remembered and what he wrote in his notes, were not identified at the time. Moreover, any accidental misreading or

misinterpretation of Bergstrom's notes by Brant would not have been caught before the Magistrate received the affidavit.

Agent Brant submitted the warrant applications to the Magistrate early in the evening on April 12, 2004. (<u>Id.</u> at 122). At that time, he was unaware that one of Defendant's computers (a laptop), along with a digital camera, had been seized by ICE agents in New York; he knew simply that Defendant was in custody and that he "was talking." (<u>Id.</u> at 148, 150). Similarly, the fact that the New York ICE agents initially found no child pornography or other evidence directly supportive of the Russian molestation allegations did not reach Brant until a day or two later, after the warrants had been signed. (<u>Id.</u> at 150).

4. <u>SUMMARY OF THE *FRANKS* ALLEGATIONS AND ACTUAL FACTS</u>

The following chart juxtaposes the text from the challenged portions of the affidavits[9] with the facts of what was said (or written) by whom on April 12, 2004. What it shows is that, apart from one or two admitted errors of attribution by Agent Brant, the relevant substance of the Fankhauser/Hernandez interview was accurately communicated to the Magistrate who authorized the search of Defendant's house.

---

[9] The Court admitted as evidence in the July 5 hearing a copy of the Application and Affidavit for Search Warrant for Defendant's house. <u>See</u> Exhibit 12 from that hearing. All references are to paragraphs from the affidavit contained in that exhibit.

| Affidavit | Fankhauser | Hernandez | Agents |
|---|---|---|---|
| "[B]oth stated that they saw a desktop and laptop computer inside KAPORDELIS' new house" (¶ 39) | Def. shuttled laptop back and forth from work. (Doc 135-38)<br><br>Could not remember if she saw computer at Christmas party. (Doc 135-39) | Familiar with laptop at work. (Doc 135-61)<br><br>Remembered seeing computer in Def's bedroom at Christmas party. (Doc 135-63) | Both agents' notes have entries re: Fankhauser seeing desktop computer at Def's house during holiday party. (Doc 135-83, 129-30)<br><br>Brant testified he recalled both women mentioning computer at Def's house. (Doc 135-129) |
| "Both also stated that they observed [a] digital camera belonging to KAPORDELIS inside his residence." (¶ 39) | Saw Def taking photos at Christmas party; could not recall if camera was digital. (Doc 135-39-40)<br><br>Did see digital pictures of party on Def's computer at work. (Id.) | Saw Def taking photos at Christmas party; could not recall if camera was digital. (Doc 135-61, 70)<br><br>Did see digital pictures of boys on Def's computer. (Doc 135-40, 70) | Bergstrom's notes contained entry indicating Hernandez saw digital camera at Christmas party. (Doc 135-83)<br><br>Bergstrom's notes also included reference to Def showing Hernandez digital pictures of boys while she was at Christmas party. (Doc 135-84, 86) |
| "KAPORDELIS routinely has children over to his house." (¶ 38) | Boys did stay with Def. (Doc 135-41-42) | Boys did stay with Def. (Doc 135-65, 67) | Def. had kids from overseas stay with him, with one being "at his house on and off all the [time]." (Doc 135-87-88) |
| "KAPORDELIS brings children from Russia, Africa, and the Czech Republic to live with him for periods of time." (¶ 38) | These boys came from Africa and the Czech Republic. (Doc 135-42) | These boys came from "from outside the United States." (Doc 135-65) | Some of Def.'s child visitors came from overseas. (Doc 135-87-88, 126-27) |

5.   FANKHAUSER'S AND HERNANDEZ'S INTERVIEW SUPPORTS PROBABLE CAUSE
     FOR THE SEARCH WARRANTS.

     Affidavits should not be analyzed, as Defendant suggests, in
a hyper-technical manner with an exhaustive critique of each word
contained in the affidavit.  Instead, affidavits should be reviewed
in a common sense manner, as they are typically prepared by non-
lawyers in the midst of pressures and tensions of an active
criminal investigation.  United States v. Ventresca, 380 U.S. 102,
108-109, 85 S.Ct. 741, 746 (1965).  Viewed in this proper manner,
the information supplied by Fankhauser and Hernandez, as related by
Agent Brant, provided a sufficient nexus between Defendant's
Russian crimes and his personal residence such that the Magistrate
could reasonably conclude that, more likely than not, located at
Defendant's house and on his computer(s) would be additional
evidence of his crimes.

     While it is undisputed that Brant made mistakes in drafting
his affidavit, it is also uncontested that he was "in the midst and
haste of a criminal investigation." Ventresca, 380 U.S. at 108.
He and Agent Bergstrom, under pressure from the looming deadline of
Defendant's arrival in New York that afternoon, were forced to
interview Fankhauser and Hernandez together, rather than
separately.  Brant then raced to Atlanta to finalize the affidavit
and obtain approval from an Assistant United States Attorney;
following that, he hurried back to Gainesville to present his
finished product to a federal Magistrate.  That he included

-16-

"Russia" along with the Czech Republic and Africa as a source for young boys who stayed with Defendant is unfortunate but also understandable and excusable.  Indeed, because the quite limited "factual discrepancies in the affidavit were not deliberate and did not undermine the probability" that the evidence sought would be found in Defendant's home, the mistakes should be deemed harmless. <u>United States v. Glinton</u>, 154 F.3d 1245, 1256 (11th Cir. 1998).

Predictably, Defendant, in his brief, endeavors to shift the Court's focus away from the central question of whether the information from Fankhauser and Hernandez provided a sufficient link between his Russian activities and evidence that might be found in his home and towards the narrow issue of whether Defendant's home computer(s) would contain child pornography.  This artificially constrained focus ignores that, as specified in its search warrant applications, the Government was looking for far more than child pornography.  The Government's clearly-stated position was that there was probable cause to believe that, in Defendant's house, there was evidence of Defendant's crimes related to violations of 18 U.S.C. §§ 2252(a) (child pornography), 2252A (child pornography), <u>and</u> 2423(b) (traveling in foreign commerce with intent to engage in illicit sexual conduct).

While the Government has always maintained that there was probable cause to look for child pornography (most likely pornography that Defendant himself created, rather than downloaded

-17-

from other sources), it has also always argued that the search warrant affidavit provided more than that.  In particular, the affidavit established probable cause to look for other, potentially non-pornographic evidence of Defendant's overseas (and domestic) molestations of boys.  Such items would include digital pictures of his victims, travel documents, and diaries or notebooks related to Defendant's criminal conduct.  Even if some of these images and items were not pornographic, they would still constitute valuable evidence of Defendant's crimes, both here and abroad.

Clinging to his view that the Government's sole purpose for the search was to locate child pornography, Defendant relies on United States v. Zimmerman, 277 F.3d 426 (3d Cir. 2002), to support his claim that there was insufficient probable cause.  Zimmerman, however, is readily distinguishable.  In that case, there was significant evidence that Zimmerman, a high school teacher and basketball coach, sexually molested some of his students.  The only information related to computers, however, was that many months prior to the search warrant application one alleged victim claimed that he saw adult pornography on defendant's computer.  Id. at 429-30.  Moreover, there was no evidence that the defendant ever possessed child pornography.  Id. at 432.  Thus, the Third Circuit determined that there was no probable cause to search his home for child pornography.

In the present case there was significant evidence set forth

-18-

in the affidavit (i.e., the allegations of the Russian victims) that Defendant manufactured child pornography by taping kids in the shower and when molesting them.  Moreover, there was evidence that Defendant stored and saved that information on his laptop computer.  Thus, <u>Zimmerman</u> provides no support for Defendant's motion.[10]

Additional legal support for the Magistrate's conclusion that relevant evidence would more likely than not be found in Defendant's house came from Agent Brant's accurate portrayal of Defendant as someone with an active, overt, and acute interest in young children.  For example, in <u>United States v. Hay</u>, 231 F.3d 630, 632-34 (9th Cir. 2000), the defendant described on his website extensive innocent contacts with children, including teaching skiing, babysitting, working as a camp counselor, and volunteering in early primary classrooms.  In affirming the issuance of a search warrant for defendant Hay's computer for evidence of possession and distribution of child pornography, the court rightly considered "Hay's extreme interest in young children." <u>Id.</u> at 634.

---

[10]  The same is true for Defendant's reliance on <u>United States v. Gourde</u>, 382 F.3d 1003 (9th Cir. 2004).  That case is similarly inapposite, in that it involved a search warrant affidavit alleging possession of child pornography downloaded from a commercial website.  Gourde was shown to have been a paying "member" of such a website, but the Government offered no evidence that Gourde had actually downloaded anything from the site.  Mere membership, according to the Ninth Circuit, was not enough to support the issuance of the warrant.  Here, of course, the allegation is that Defendant was his own source of child pornography: he molested children and produced his own child pornography therefrom.  This was the evidence sought and the evidence for which the Russian boys' allegations provided direct support.

Defendant, as described by his own colleagues, fits Hay's profile. As detailed above, both Fankhauser and Hernandez explained that Defendant was known to house young boys from other countries and that he was active in groups such as Young Life. Hernandez even went so far as state that she simply could not think of anyone else who surrounded himself with children as much as Defendant did. (Doc 135-69). Applying the logic of <u>Hay</u>, this information, along with Defendant's well-documented contacts with boys in Russia, including inviting them, alone, to his hotel room after hours, provided additional support for the issuance of the search warrants.

*   *   *

Defendant, alleging falsity and materiality, has shown neither. His own co-workers -- and not Agent Brant -- put a computer (or two) in his house and a digital camera in his hands. They also put him with young boys, both here and abroad. Agent Brant could have been more careful in vetting his 31-page affidavit, if he, too, were given the luxury of a two-week briefing schedule. But he was working against real-life deadlines, with a suspected serial child molester arriving back in America in a matter of hours. There is absolutely no evidence that his errors were intentional nor has there been a showing that, given the totality of the affidavit and now, with the sworn testimony of Fankhauser and Hernandez, that the mistakes were material.

### III. SEIZURE OF COMPUTER IN NEW YORK

The second area of testimony at the July 5, 2005 hearing related to Defendant's voluntary consent to allow ICE agents to search is laptop computer.  Because of both the border search exception and Defendant's consent, Defendant no longer has any reasonable expectation of privacy in the contents of that computer so that a search warrant for that computer was not required.  Thus, Defendant's motion to suppress this evidence must be denied.

Defendant was detained by ICE agents when he arrived at JFK Airport in New York on April 12, 2004, returning from Russia.  He had in his possession a laptop computer, two digital cameras, and various digital storage media, including a computer hard drive, a memory stick and videocassettes.  The New York-based ICE agents, including Agent Jerome Coleman, who met with him were advised by the Atlanta-based agents that Defendant was suspected of having committed sexual acts against boys in Russia.  (Doc 135-153).  Agent Coleman and Agent Fitzsimmons were asked to interview Defendant, but, at that point, there was no arrest warrant for Defendant.  (Id. at 153-54).  When Defendant's plane landed and Defendant reached the initial customs inspection point, the agents approached Defendant, showed him their credentials, and asked to speak with him.  (Id. at 155-56).  Defendant did not indicate any unwillingness to speak with the agents, was informed that he was not under arrest, and was told why the agents wanted to talk to

him. (<u>Id.</u> at 156-57).  At this time, Defendant spoke in general terms about his visits to Russia and his belief that he was being set up by Russian authorities.  (<u>Id.</u> at 157-58).

Approximately 20-30 minutes later, the ICE agents received a fax containing an arrest warrant for Defendant.  (<u>Id.</u> at 157, 168). Defendant had never been handcuffed, but he was shown the arrest warrant and *Mirandized* at that time.  (<u>Id.</u> at 157-59).  Defendant indicated he understood his rights and voluntarily waived his rights.  (<u>Id.</u> at 159-60).  In fact, Defendant was eager to speak to the agents and claimed that this investigation originated from a letter of complaint he wrote to the Grand Europe Hotel about his visits at the hotel with young boys.  (<u>Id.</u> at 160-61).  Without any request by the agents, Defendant then offered to show the agents a copy of the letter, which was on his computer.  (<u>Id.</u> at 161).

Defendant then turned on his laptop computer and showed the complaint letter to Agent Coleman.  (<u>Id.</u> at 161).[11]  After viewing the letter, Agent Coleman asked Defendant if there was any pornography on his computer to which Defendant responded, "Not that I'm aware of."  (<u>Id.</u> at 162).  Agent Coleman then asked, "Would you mind if I look through the computer for images, briefly?"  (<u>Id.</u> at

---

[11] While defense counsel persists on referring to this letter and the issues at the Grand Hotel Europe as an "extortion attempt," Defendant's contemporaneous e-mails expose this thinly-veiled attempt to provide cover for Defendant's illegal acts.

162).  Defendant did not hesitate in saying, "Yeah, go ahead."[12] (Id.).

Defendant did not place any limitations on Agent Coleman's viewing of the computer and did not indicate any files, folders or other areas of the computer would be off-limits to Agent Coleman. (Id. at 162).  Additionally, Defendant never told Agent Coleman to stop looking at his computer or otherwise limited Agent Coleman's time frame in viewing the computer.  (Id. at 162-63).  Agent Coleman conducted a few searches for image files (.jpg, .gif, .wmv, etc.) and reviewed a random sampling of pictures for 10-15 minutes. (Id. at 163-65).  Defendant saw "quite a few" pictures of boys but did not see any pornography.  (Id. at 164).  Importantly, none of the files Agent Coleman viewed were password protected.  (Id. at 165).  While Defendant never placed any time limitations on Agent Coleman's search of Defendant's computer, Agent Coleman only looked for a few minutes because it was getting late and he needed to process Defendant's arrest, transfer Defendant to a pretrial holding facility, and go back to his office to secure Defendant's belongings.  (Id. at 165-68).

Agent Coleman did not return to his review of Defendant's computer because Defendant's case was based out of the Atlanta ICE

---

[12] Defendant also offered to show Agent Coleman a movie file from his camcorder.  (Id. at 170)  Because the room in which Defendant was being interviewed did not have an electrical outlet, Coleman only viewed the file for a brief period.  (Id. at 170).

office.   (<u>Id.</u> at 169).   Therefore, the following week, Agent Coleman sent Defendant's computer and other items to Agent Brant in Atlanta.   (<u>Id.</u> at 169).   If this was a New York-based case, Agent Coleman would have searched Defendant's belongings, including his computer, as a matter of course.   (<u>Id.</u> at 169).

1.   <u>Defendant Has No Reasonable Expectation Of Privacy In His New York Computer</u>

As explained in the Government's Response to Defendant's Motion to Suppress Evidence (Doc 121), the Government did not need a search warrant to search the New York laptop computer because it was a valid search under the border search exception. Additionally, as borne out by Agent Coleman's undisputed testimony, Defendant lacks any reasonable expectation of privacy in his New York computer and, therefore, has no standing to contest the validity of the search warrant for this computer.   Indeed, because of the border search exception and Defendant's lack of a reasonable expectation of privacy, a search warrant was not even needed to search this computer.

Defendant, after being arrested, <u>volunteered</u> to show the agents a document on his computer.   Certainly, it is reasonable to assume that the agents would ask, in light of the allegations against Defendant, whether there was any pornography on Defendant's computer.   In fact, that is exactly what Agent Coleman did.   He asked for permission to browse Defendant's computer, and Defendant consented without hesitation or limitation.   (<u>Id.</u> at 162-63).

-24-

Defendant did not have any files password protected, did not tell Agent Coleman not to look in certain files or folders, and did not tell Agent Coleman to stop looking at his computer. (<u>Id.</u> at 162-65). In essence, Defendant laid open his computer and gave Agent Coleman carte blanche to review anything the Agent cared to review.

Defendant's bare-all attitude with respect to his computer vitiates any reasonable expectation of privacy he may have had with respect to files on his computer. While Agent Coleman only looked at the computer for 10-15 minutes and did not review all the files, Defendant had no way of knowing how long Agent Coleman would look at the computer or which files he would review. Thus, even though the initial search by Agent Coleman was not nearly as thorough as the forensic examination later conducted by ICE agents, Defendant voluntarily gave up any reasonable expectation of privacy in that computer and, therefore, has no viable Fourth Amendment argument that the fruits of that search should be suppressed. <u>See</u> <u>Katz v. United States</u>, 389 U.S. 347, 361, 88 S.Ct. 507, 516 (1967) (search can only be unreasonable if person has reasonable expectation of privacy in object of search; without an expectation of privacy, the Fourth Amendment is not implicated); <u>United States v. Holzman</u>, 871 F.2d 1496 (9th Cir. 1989) (overruled on other grounds in <u>Horton v. California</u>, 496 U.S. 128, 110 S.Ct. 2301 (1990)) (subsequent thorough search of address book seized and briefly reviewed when defendant arrested valid; time delay in later search not relevant

because defendant had no reasonable expectation of privacy in contents of address book); United States v. Johnson, 820 F.2d 1065, 1072 (9th Cir. 1987) ("once an item in an individual's possession has been lawfully seized and searched, subsequent searches of that item, so long as it remains in the legitimate uninterrupted possession of police, may be conducted without a warrant"); United States v. Burnette, 698 F.2d 1038, 1049 (9th Cir. 1983) (cursory search of purse defendant arrested, subsequent more thorough search without warrant valid).

Additionally, the government could search Defendant's computer pursuant to both the border search and search incident to arrest doctrines. See United States v. Cascante-Bernitta, 711 F.2d 36, 37 (5th Cir. 1983) (border search); United States v. Roberts, 86 F.Supp. 2d 678, 688-89 (S.D.Tex. 2000) (listing various courts that have analogized searches of computer files and hard drives to routine border searches of an individual's closed containers and closed personal effects); United States v. Santiago, 837 F.2d 1545, 1548 (11th Cir. 1988) ("Warrantless searches at international borders of the United States may be conducted without any suspicion of criminal activity."); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034 (1969) (search incident to arrest).  As explained in prior court filings, the search warrant for the New York laptop computer was valid in its own right, but was also a "belts and suspenders" approach by the government to insure the validity of

the search of that computer because no search warrant was needed. Therefore, the Court should deny Defendant's motion to suppress the items seized in New York.

## IV. CONCLUSION

For the foregoing reasons, and for all the reasons cited in previous briefs, the Government requests that the Court deny Defendant's motion to suppress.

Respectfully submitted,

DAVID E. NAHMIAS
UNITED STATES ATTORNEY


/s/ *Aaron M. Danzig*

AARON M. DANZIG
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 205151


/s/ *Robert C. McBurney*

ROBERT C. McBURNEY
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 481070

600 U.S. Courthouse
75 Spring St., S.W.
Atlanta, GA  30303
(404)581-6000
(404)581-6181 (Fax)

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by electronic delivery:

        Donald F. Samuel, Esq.
        W. Charles Lea, Esq.
        Garland, Samuel & Loeb, P.C.
        3151 Maple Drive, NE
        Atlanta, Georgia 30305

This 22d day of August, 2005.

            /s/ Aaron M. Danzig

            AARON M. DANZIG
            ASSISTANT UNITED STATES ATTORNEY

-28-