# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STAES OF AMERICA,  ) | |
| ) | |
| v.                                            ) | CASE NO. 1:04CR249-CAP |
| ) | |
| GREGORY C. KAPORDELIS,   ) | |
| ) | |
| Defendant.                        ) | |

## REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE (*FRANKS v. DELAWARE* AND PROBABLE CAUSE CLAIMS)

Defendant Gregory Kapordelis filed three separate objections to the Reports and Recommendations of Magistrate Brill. One objection focused on discovery disputes. The government responded to the defendant's objections and the defendant filed a reply to the government's response on March 17, 2006. Two other objections focused on the recommended denial of the Motion to Suppress. One objection concentrated on the government's argument that a search of one computer was justified under both the "border search" and "search incident to arrest" exceptions to the warrant requirement. The government responded to that objection and the defendant is filing a reply to that response on March 20, 2006.

1

This pleading addresses the issues in the Motion to Suppress which challenge the validity of the search warrant because of the misrepresentations and omissions in the search warrant application (*Franks v. Delaware*) and because the search warrant application (once pruned of its misrepresentations) did not establish probable cause to search the computers found in the home of Dr. Kapordelis.  The Magistrate rejected both arguments in her Report and Recommendation (Doc. 165).  The defendant filed his objections to the Report and Recommendation on January 13, 2006.  The government filed its response to the defendant's objections on February 10, 2006 (Doc. 196).  This pleading represents the defendant's reply to the government's response.

First, it bears repeating what should be painfully obvious at this point: the defendant has demonstrated that there are errors of significant proportions throughout the search warrant application.  One searches in vain for a single substantive paragraph in the search warrant application that is free from error.  These are not errors that only a strict grammarian would discern from a close reading of the text.  The errors, as documented over and over in the defendant's prior pleadings and exhibits, go to the core of the government's claim that probable cause existed to support the search of the home of Dr. Kapordelis.  Witnesses whose credibility appear to be beyond

reproach, it turns out, have offered various inconsistent versions of the events that are described in the warrant application; witnesses who were described as having matter-of-factly described acts of molestation, were, it turns out, previously threatened, beaten, and molested by agents of the Russian government prior to making their allegations. *American* agents, including the affiant, recklessly (and in some instances intentionally) omitted known information about the doubtful credibility of the information that was contained in the search warrant application. Other information was simply fabricated from who-knows-where. Dates of occurrences were changed – not because it simply didn't make a difference, but because the date that a supposed act of molestation occurred simply was impossible. So, by sleight of hand, the alleged date was simply changed in the search warrant application. The fact that prior searches of the target computers revealed no contraband or pornography was either hidden from the Magistrate, or minimized, in order to enhance the claim that there was probable cause to believe that evidence would be found in the computers. The search warrant application also camouflaged the identity of a key figure in the Russian investigation, Andrei Lapov, who was a documented child abuser and who had played an instrumental role in the gathering of evidence

(i.e., he induced children who previously denied any wrongdoing on the part of Dr. Kapordelis to suddenly make allegations).

These facts, presented in summary fashion above, are documented, line-by-line, word-by-word, in hundreds of pages of pleadings and exhibits that were furnished to the Magistrate.

The thrust of the government's response is that none of this should be believed by the judge. That is certainly an understandable position for the government to take. But it is a *legally irrelevant* position. *Franks v. Delaware* does not reduce claims of material misrepresentations and material omissions in search warrant applications to a swearing contest between counsel. These claims cannot be resolved on the basis of who argues the most, the loudest, or with the most eloquence. The resolution of this motion requires a hearing.

And that brings us to the second simple point: the defendant is not urging the court to summarily grant the Motion to Suppress. The defendant did not urge the Magistrate to summarily grant the Motion to Suppress. The defendant's request is considerably more modest. The defense simply wants to be heard. The defense simply wants a forum to present witnesses in support of his claims. The defendant asks for nothing more that what the Fourth Amendment and the Due Process Clause guarantee: the right to

4

present evidence in support of his claims so that an impartial fact-finder can decide, based on admissible evidence, whether the allegations (*already* supported by affidavits, exhibits, videotaped statements, and government-authored reports) demand the relief that he requests.

Once a hearing is held, the court can proceed to the second aspect of the Motion to Suppress, and that is determining whether, given the information actually known to the affiant and which he could have and should have, in good faith, presented to the Magistrate, there was probable cause to search the home of Gregory Kapordelis.  The defendant contends that the search warrant *as written* does not establish probable cause to search his home.  After all, virtually all of the alleged crimes occurred in Russia and the agents knew that the defendant had his computer in Russia (or at JFK Airport) with him when the searches were executed.  There was no credible information to support the belief that there was any evidence of a crime in the home of Dr. Kapordelis.  But more importantly, once the *Franks v. Delaware* project is completed, there was not even a sliver of cause to believe that any evidence of a crime could be found in his home.

There is little information contained in the government's responsive pleading that addresses the core issues in the defendant's Motion to Suppress.  Characteristic of its position in many of its prior pleadings, the

government argues that no hearing is necessary. No witnesses should be called to the stand, the judge (Magistrate and District Court) should defer to the government's agent who prepared the search warrant application and no further inquiry is necessary.  Indeed, in its response to the Objections to the Report and Recommendation, the government does not even address most of the arguments advanced by the defense; rather, it blithely urges the court to accept the conclusions of Magistrate Brill wholesale.

A few points, however, should be pointed out, however, where the government simply misrepresents the state of the record (and in some instances, the law).

First, the government argues (Doc. 196, page 2, 3 and 8) that a *Franks* claim requires proof that the affiant knowingly and intentionally included materially false statements and knowingly omitted exculpatory information in the affidavit.  Though the defendant believes that he has actually satisfied even that standard, the *Franks* standard actually requires proof that the affiant knowingly *or recklessly* includes materially false statements in the affidavit.  As demonstrated in the material furnished by the defense to the court, there are dozens of instances in which the affiant included information in the search warrant application that was contradicted in his colleagues' reports upon which he relied in preparing the search warrant application.

Whether Agent Brant *intentionally* changed dates, omitted prior statements of witnesses that were contradictory, or omitted information that demonstrated that there was no probable cause to search the home; or whether he *recklessly* engaged in this deception can never be proved. The defense does not have a statement from the affiant that he was planning on intentionally submitting false information to the search warrant magistrate. Nor is the defendant required to have such information.  It is enough that the affiant did, in fact, have the reports of the contradictory and exonerative information in his possession, *and* he relied on those reports in preparing the search warrant affidavit, *and* he changed information and redacted other information. That amounts to recklessness; and that is all that the defendant is required to prove.  *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993); *United States v. Vigeant*, 176 F.3d 565 (1st Cir. 1999).

      The government repeatedly relies on the doctrine that a "hypertechnical" approach to evaluating a search warrant is not permitted (Doc. 196, p. 3).  We agree.  But that does not mean that the government is entitled to rely on an affidavit that is rife with errors, misrepresentations and omissions in virtually every paragraph.  Labels provide little guidance to the court.  A hearing in which the facts can be aired will provide considerably more assistance to the court than reciting labels such as "hypertechnical."

7

The court should decide, based on an evaluation of the evidence presented at a hearing, whether the pervasive errors in the application amount to hypertechnical mistakes, or a concerted effort to create probable cause where none otherwise existed.

Interestingly, for the first time in its Response to the Objections, the government now relies on the "lost in translation" excuse for many of the errors in the search warrant application (Doc. 196, p. 5). This excuse is further augmented with the allusion to a child's game of "telephone." Thus (according to the government), the mistakes in the search warrant application start with a translation error from Russian into English and these errors were compounded by the "international game of 'telephone'" that resulted in the preparation of the search warrant application (Doc. 196, p. 6) (these are the government's words!).

While this is an interesting approach, there are two reasons that the court should be skeptical of this new excuse. First, the government has not revealed a single "translation" mistake in the entire search warrant application. Second, the Magistrate who was asked to issue the search warrant was not warned that the information contained in the application might be tainted by "translation" errors. In fact, the vast majority of the errors in the search warrant application reflect Agent Brant's omission of

8

information contained in other American agents' reports – reports written in the King's English; and his failure to accurately report what *he* learned during his own limited interviews of Americans in Gainesville, Georgia. He did not have translation problems with these interviewees: he simply changed what they told him in order to enhance the amount of information that the government claimed it had to support the issuance of a search warrant. Coupled with the effort to hide the involvement of Andrei Lapov in the Russian investigation, these errors have nothing to do with "translation" problems. But the defendant does applaud the government's newest euphemism. This would certainly provide a novel exception to the Fourth Amendment's requirement that a search warrant be based on probable cause: unless the information known to the government is in a foreign language, in which case, "do the best you can."

The government also repeatedly states that Magistrate Brill reviewed each and every allegation presented by the defendant. As documented in the defendant's initial Objection to the R&R (Defendant's Objections pp. 42, 44-45, 47), Magistrate Brill ignored dozens of the claimed inaccuracies in the search warrant application just in regard to the three identified juveniles

who supposedly claimed to have been molested.[1]  And many of the inaccuracies that *were* considered by Magistrate Brill were held to be legally inconsequential because the information that was omitted (or shown to be false) was only known to the Russians.  Again, as set forth in defendant's initial objections, much of this information *was* known to the American agents and what wasn't should be attributed to them.  In addition, Magistrate Brill deferred ruling on the critical legal question whether information known to Russian police officers should be attributed to the American affiant.  Magistrate Brill concluded that this legal question need not be answered: rather, she assumed that all such information would be attributed to the affiant (Doc. 165, p.42). Yet, the R&R then proceeds to ignore a considerable amount of the information known to the Russian police on the basis that this information was not known to the Americans!  If the information is to be attributed, then it must be attributed.  If not, the legal issue must be forthrightly decided.  As pointed out repeatedly in the defendant's various pleadings, the resolution of this legal question requires a hearing to determine the underlying facts.  In other words, to decide whether the information known to the St. Petersburg police should be attributed to the affiant and other ICE agents, the court needs to have a firm factual

---

[1] The initial Objection also reviews other information that was documented in the Motion to Suppress, but ignored by Magistrate Brill, e.g., pages 55, 57-58, 74, 76.

record relating to the extent that their investigation was a "joint investigation" (as they repeatedly boast) and information was regularly shared between the two law enforcement agencies.

The government writes that the juveniles' recantations occurred after the issuance of the search warrant (Doc. 196, p. 7). First, two of the three identified juveniles in the search warrant actually denied that there was any act of molestation *before* the issuance of the search warrant; the third juvenile had not made any allegation to anybody for months, until he was approached by Lapov and encouraged (that's our euphemism) to come forward; so the government is simply factually wrong. Second, the "recantations" that occurred after the search warrant was issued are important *not* simply because they are recantations. Rather, the information contained in these statements (each of which has been furnished to the court and the government) explains *why* the false accusation was made prior to the issuance of the search warrant: the juveniles were threatened by Russian agents and forced to make the false allegations. Those threats occurred prior to the issuance of the search warrant.

At great length, the government urges the court to disregard many of the documented misrepresentations in the affiant on the basis that Agent Brant was simply ignorant of the truth (Doc. 196, p. 9-11). Throughout the

11

course of this litigation, the defendant has addressed this point.  First, there are many instances of misrepresentations that Agent Brant knew, or had at his fingertips, such as the prior denials of the juveniles that anything had happened; such as the change of dates that events supposedly occurred; such as the identity of the "confidential informant" – i.e., Andrei Lapov; such as the actual statements made by the co-workers in Gainesville; such as the absence of contraband found on the computer during prior searches; such as the denials by other juveniles that anything inappropriate occurred during Dr. Kapordelis' visits to the orphanages; such as Dr. Kapordelis' *pre-existing* allegation that he was being extorted by the Hotel which initiated these charges.[2]  Second, as just argued, the defendant argues that

---

[2] The government (and to some extent, Magistrate Brill) denigrates the importance of the extortion letter that was known to the government prior to the issuance of the search warrant.  The defense has explained the importance of this letter repeatedly and will not repeat the argument here.  Suffice it to say, that *prior* to any allegation of misconduct by any law enforcement agency, Dr. Kapordelis documented in a letter he wrote to the Hotel that he feared that the Hotel was trying to extort money from him.  This was not a *post hoc* "c.y.a." letter, but a document that existed (and allegations that existed) prior to any law enforcement involvement in this case.  Moreover, there are witnesses (Alla Regan and Eva Recanska) who both have offered affidavits in support of the claim that there was an extortion attempt by the Hotel.  To be sure, Agent Brant may not have known about Regan's and Recanska's position on these matters at the time that he authored the search warrant application, but the government cannot *now* claim that the entire extortion theory is fabricated, given what is *now* known.  What was *then* known to the agents was that there had been an allegation of extortion, and rather than following up on a clear signal of

12

information known to the Russian police should be attributed to the American affiant, in light of the fact that this was joint investigation and information was being shared between the two agencies.

Third, at an evidentiary hearing, the court can determine for itself whether the affiant was acting in good faith, innocently passing on erroneous information, or whether he was actually "massaging" the information, intentionally omitting information that he had in his possession, and otherwise endeavoring to mislead the Magistrate into believing that there was no question but that Dr. Kapordelis was hiding evidence of criminal activity in his house.

Finally, the government argues that with or without the *Franks* corrections, there was probable cause to search the home of Dr. Kapordelis. The defendant's argument on this point is set forth in great detail, with supporting authority in the Objections (pp. 124 – 152). Certain factual recitations in the government's brief, however, deserve special mention. First, it is simply untrue, as alleged by the government that "several of the juvenile victims" claimed to have been photographed by Dr. Kapordelis, and later shown the photographs (Doc. 196, p. 18; 21). This occurred with one juvenile. Significantly, two prior searches of the computer failed to

---

concern, the agents ignored the information and hid it from the Magistrate who was being asked to issue the search warrant.

corroborate this statement by the juvenile: that is, when searched twice, the computer failed to reveal the elusive "shower" picture. The other paragraphs in the search warrant application refer to allegations by a "C.I." (now known to be Andrei Lapov), who claimed that the defendant was manufacturing child pornography while in Russia – a claim that the government apparently concedes is completely bogus.

Moreover, the government fails to note two other critically important facts regarding pictures in general: (1) the government knew that the computer and digital camera that contained photographs had already been seized by the ICE agents in New York and would not be found in the home of Dr. Kapordelis; (2) the computer had *already been searched*, not once, but twice, by Russian police and the ICE agents in New York,[3] and there was no pornography found during either search.

The government seeks to add ballast to its argument by pointing out that *four* Magistrates have found probable cause to have existed. Three of the Magistrates, however, were given a search warrant application that was destined to be approved. Indeed, presumably every Magistrate in this District, and every other District, would issue a search warrant if s/he were

---

[3] *See United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984) (requiring officer to report any chance in circumstances to the Magistrate after the warrant is issued, but prior to the execution of the search).

told that five witnesses reported that they personally observed cocaine in a person's desk drawer.  But if the Magistrates had also been told that one of the witnesses had never been at the location, two others had previously repeatedly denied ever seeing any cocaine in the drawer, before making the allegation, the fourth was beaten by agents prior to making the claim; and the fifth was blind, presumably the Magistrates would reach a different conclusion about the propriety of issuing a search warrant.

## CONCLUSION

The defendant urges the court to lay the pleadings aside.  There have been hundreds of pages of motions, responses, and Magistrate rulings.  Exhibits abound.  This court should do what it is best at doing: set this matter down for a hearing and see for yourself what the witnesses have to

say. Then a decision can be made, based on a record that will speak for itself.

                              Respectfully submitted,

                              GARLAND, SAMUEL & LOEB, P.C.

                              DONALD F. SAMUEL
                              Ga. State Bar #624475

3151 Maple Drive, NE
Atlanta, Georgia  30305
404-262-2225
Fax 404-365-5041
dfs@gsllaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **CASE NO. 1:04-CR-249-CAP** |
| ) | |
| **GREGORY C. KAPORDELIS,** ) | |
| ) | |
| **Defendant.** ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 20th day of March, 2006, I have served a true copy of the within and foregoing *Reply to Government's Response to Defendant's Objections to the Report and Recommendation of the Magistrate (Franks v. Delaware and Probably Cause Claims)* upon Aaron Danzig, Assistant United States Attorney, via electronic filing.

DONALD F. SAMUEL
Ga. State Bar 624475